J-S63044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| KATIE BRITTON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| ALEKSEY N. MAKSIMOV | |
| Appellant | No. 2238 EDA 2015 |

Appeal from the Judgment of Sentence Entered May 27, 2015
in the Court of Common Pleas of Bucks County Civil Division
at No(s): 2012-60700-A

BEFORE: FORD ELLIOTT, P.J.E., SHOGAN, J., and FITZGERALD,[*] J.

MEMORANDUM BY FITZGERALD, J.:         **FILED FEBRUARY 23, 2017**

Appellant, Aleksey N. Maksimov, appeals from the judgment of sentence of six months' imprisonment entered in the Bucks County Court of Common Pleas for indirect criminal contempt.[1] Appellant argues that there was insufficient evidence of contempt, and that the trial court abused its discretion by (1) denying him discovery under the Rules of Criminal Procedure, (2) refusing to permit him to represent himself *pro se* during trial, and (3) imposing an excessive sentence. We affirm.

The trial court set forth the factual and procedural history of this case as follows:

---

[*] Former Justice specially assigned to the Superior Court.

[1] 23 Pa.C.S. § 6114.

[Appellant] and Appellee Katie Britton were close friends since childhood, described by Ms. Britton as "best friends." The troubling events that eventually transpired between the parties took a turn for the worse after Appellee terminated their intimate relationship. After the termination of the parties' relationship, Appellant appeared at Appellee's residence unannounced and was spotted peering through Appellee's windows. After Appellant failed to leave when told to do so, Appellee contacted the police. Appellant was warned to stay away from Appellee's residence by the police but Appellant returned shortly after the police left to do burnouts back and forth in front of Appellee's property.

A few days later, Appellant returned to Appellee's residence. When commanded to leave, Appellant physically forced his way into Appellee's residence where an argument ensued between the parties. Appellant deprived Appellee of her cell phone when she threatened to contact the police. When Appellant left, Appellee resorted to contacting her friend through Facebook and had the friend report the incident to the police on her behalf. Thereafter, Appellant was arrested on February 24, 2012.

After Appellant was released on bail on February 28, 201[2], Appellant apologized to Appellee for his behavior and the two reconciled as friends. However, afterwards, Appellant had an argument with Appellee in front of Appellee's father's residence. When Appellee chose to leave, Appellant followed Appellee down the road in his car while arguing with Appellee the entire time. The parties drew attention from other drivers and when one stopped to speak with Appellee, Appellant became aggravated and subsequently left his car and chased Appellee on foot, tackling Appellee several times and forcefully restrained her while she was on the ground. Appellant threate[ne]d that he would "fuck up" Appellee's life if she contacted the police. Only with the help of a neighbor that heard the commotion did Appellant temporarily leave.

Appellee proceeded to walk home while on the phone with a friend but was again ambushed by Appellant. This time, Appellant forcefully deprived Appellee of both her cell

phone and her keys. Appellee's friend contacted the police and Appellee was able to dial 911 before Appellant cancelled the call. Appellant did not return the keys until after hearing police sirens and when another one of Appellee's friend chanced by in his car and stopped to intervene. Appellee was escorted home by the friend where the police were waiting.

Later, when Appellee was at the police station filing a police incident report of the events that was just described, she noticed that Appellant was driving by the police station. Appellee notified the police and Appellant was apprehended near the police station on March 20, 2012. As a result of the above behavior and other behavior too extensive to be summarized herein, the [c]ourt entered a PFA [Protection From Abuse] Order against Appellant on April 4, 2012, prohibiting Appellant from having "ANY CONTACT" with the Appellee [for three years], "either directly or indirectly" . . . "at any location." Further[,] the original Order stated in clear, unequivocal terms that Appellant "shall not contact Plaintiff" (Appellee) either directly or indirectly . . . by telephone, or by any other means, including "through third persons."[2]

In addition, testimony and documentation at the hearing in the form of docket entries, etc.in this matter indicated that Appellant[] had been convicted in [c]riminal [c]ourt of at least two matters involving the Appellee as the same complainant/victim. Appellant was convicted and received a sentence of one year['s] probation for [h]arassment under 18 Pa.C.S. § 2709(a)(1) on July 13, 2012, involving Appellee as the victim/complainant, and Appellant was ordered not to contact Appellee. Appellant was then convicted on May 29, 2013 of [s]talking under 18 Pa.C.S. § 2709.1(a)(1), and [i]ntimidation of [w]itnesses or [v]ictims under 18 Pa.C.S. § 4952(a)(2) involving Appellee as the victim/complainant, and was ordered to serve a sentence of 11.5 months to 23 months at the

---

[2] A notice provision in the order provided: "Violation of this order may result in your arrest on the charge of indirect criminal contempt which is punishable by a fine of up to $1000 and/or a jail sentence of up to six months. 23 Pa.C.S. § 6114."

Bucks County Correctional Facility with a concurrent seven year term of probation.

Conditions of Appellant's probation included no contact with the victim. Shortly thereafter, Appellant violated his concurrent term of probation by contacting Appellee from the Bucks County Correctional Facility and was subsequently sentenced on August 26, 2013 for a violation of probation to a term of not less than three years nor more than seven years at a State Correctional Facility. As indicated in the Petition for Contempt Addendum, the violation of probation included Appellant making calls to Appellee from the Bucks County Correctional Facility using his inmate account and other inmates' accounts. In addition, Appellee received calls from Appellant through countless cell phones and letters addressed to Appellee by Appellant using pseudonyms. In these phone calls and letters, Appellant sometimes threatened Appellee with physical harm and violence if she failed to withdraw the criminal charges pending against Appellant. Appellant also threatened to disclose intimate pictures of Appellee in attempts to coerce Appellee into dropping the criminal charges. At the Violation of Parole/Probation Hearing, the [c]ourt reaffirmed that Appellant was to have no contact with Appellee.

Since the Violation of Parole/Probation Hearing, Appellee enjoyed a period of respite from direct contact from Appellant. However, while it was not the subject of this matter, it appears that Appellant had contacted Appellee's mother from SCI-Houtzdale, which perhaps could have been alleged as "indirect contact" but was not raised in the case other than through testimony.

Despite the 2012 PFA Order[,] and despite being warned again to have no contact with Appellee at the Violation of Parole/Probation Hearing, Appellant resumed contact with Appellee on May 29, 2014 by sending Appellee a letter addressed from the state prison in which he was incarcerated. Appellee notified the police on the same day she received the letter in the mail and subsequently petitioned the [c]ourt for the current criminal contempt hearing against Appellant.

- 4 -

Trial Ct. Op., 1/16/16, at 3-6 (citations omitted).

On March 19, 2015, Appellee filed a detailed contempt petition alleging that Appellant violated the 2012 PFA Order by mailing her the letter on May 29, 2014. On the same date, the trial court ordered a contempt hearing. The sheriff served Appellant with the petition on March 24, 2015.

On April 7, 2015, Appellant filed a *pro se* motion seeking discovery under Pa.R.Crim.P. 573. His motion requested, *inter alia*, Appellee's cell phone records, records of her Facebook messages, and her emails and text messages. Disc. Mot., 4/7/15, at ¶¶ 11-13.

On May 27, 2015, the trial court convened a hearing to determine whether to hold Appellant in indirect criminal contempt. N.T., 5/25/15, at 3. The Public Defender appeared on behalf of Appellant, and the Commonwealth appeared on behalf of Appellee. *Id.* at 1, 3. After Appellee began testifying on direct examination, Appellant stated: "As you recall, I filed for discovery. Where's my discovery?" *Id.* at 17. The trial court denied Appellant's request for discovery, ruling that the Rules of Criminal Procedure did not authorize discovery during a domestic relations proceeding. *Id.* at 18-19. Appellant responded that he was firing the Public Defender, whom he called a "public pretender," and demanded the appointment of other court-appointed counsel. *Id.* at 19. The trial court denied Appellant's request. *Id.* at 23-25. Appellant then moved to proceed *pro se*, but the trial court denied this motion as well. *Id.* at 26-27.

The trial court described the remainder of the contempt hearing as follows:

> Appellant was continually argumentative and attempted repeatedly to disrupt the testimony of the witnesses or the [c]ourt's instructions and rulings. More disturbing were his outbursts directed towards Appellee and Detective Peter Stark. Despite being in a criminal contempt hearing for violating an existing no-contact/no harassment PFA Order against Appellee, Appellant—throughout the hearing—shouted on approximately eighteen occasions remarks in a foreign language to the Appellee. It was later determined by the [c]ourt that he was most often shouting, among other things: "I love you" to Appellee. On cross-examination of Appellee, Appellant repeatedly attempted to ask highly inappropriate questions, such as, on at least four separate occasions[,] he asked the Appellee if she loved him.
>
> At one point, later in the proceeding, Appellant also inappropriately requested to have a private conference with Appellee in a separate room despite the grave nature of the PFA contempt allegations against him. The [c]ourt has strong suspicion to believe, based on Appellant's perverse behavior and demeanor during the hearing, that it was his intent and motive all along to pervert the court system into another method for him to seek attention from Appellee and to be in the same room with her, even if just for the length of the hearing.
>
> Also, the [c]ourt notes that at the conclusion of Detective Stark's testimony, Appellant made an offhand comment to Detective Stark suggesting that Appellant had engaged in intimate relations with Detective Stark's wife. What was perhaps most startling was the fact that Appellant referenced Detective Stark's wife by her first name.
>
> Furthermore, the [c]ourt was less than impressed with Appellant's antics at the conclusion of the hearing[,] wherein he feigned a heart attack or some medical emergency and had to be carried out by court officers when he refused to leave the courtroom as directed.

Trial Ct. Op. at 7-8 (record citations omitted).  The trial court found Appellant guilty of indirect criminal contempt and sentenced him to six months' imprisonment, the maximum penalty for indirect criminal contempt under 23 Pa.C.S. § 6114(b)(1).  *Id.* at 2-3.

Appellant did not file post-sentence motions.  Nor did he appeal within thirty days after imposition of sentence.  On July 1, 2015, through court-appointed counsel, Appellant filed an unopposed petition for leave to appeal *nunc pro tunc*.  On July 6, 2015, the trial court granted Appellant leave to appeal *nunc pro tunc* within the next thirty days.  On July 21, 2015, Appellant appealed to this Court.  Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises the following issues on appeal, which we have re-ordered for purposes of disposition:

> 1.  Did the [t]rial [c]ourt err in that there was not enough evidence to prove beyond a reasonable doubt that Appellant was in contempt[?]
>
> 2.  Did the [t]rial [c]ourt err in finding . . . Appellant in contempt for a letter written on or about May 29, 2014[?]
>
> 3.  Did the [t]rial [c]ourt fail to understand the nature of the proceedings and to afford Appellant his right to criminal discovery[?]
>
> 4.  Were Appellant's rights violated when the [t]rial [c]ourt refused to allow him to proceed pro se[?]
>
> 5.  Did the [t]rial [c]ourt violate Appellant's constitutional rights by sentencing him [to] six months consecutive to his current sentence[?]

6. Did the [t]rial [c]ourt err in sentencing Appellant to a consecutive six month sentence[,] when under 23 Pa.C.S. § 6114.1(c)[,] sentence shall not exceed six months[?]

Appellant's Brief at 3.

Preliminarily, we must determine whether to quash this appeal as untimely. Although neither Appellant nor the Commonwealth raises the issue of the timeliness of the appeal, we may raise questions of jurisdiction *sua sponte*. **See Commonwealth v. Lindey**, 760 A.2d 416, 418 (Pa. Super. 2000).

Allowance of an appeal *nunc pro tunc* lies in the sound discretion of the trial judge. **See McKeown v. Bailey**, 731 A.2d 628, 630 (Pa. Super. 1999). Generally, "a [t]rial [c]ourt may grant an appeal *nunc pro tunc* when a delay in filing is caused by extraordinary circumstances involving fraud or some breakdown in the court's operations through a default of its officers." **Id.** (citation and quotation marks omitted). At the time of sentencing, the court is required to inform the defendant "of the right to file post-sentence motions and to appeal [and] the time within which the defendant must exercise those rights[.]" Pa.R.Crim.P. 704(C)(3)(a). Failure to apprise the defendant of these rights constitutes a breakdown in the operations of the court which entitles the defendant to appeal *nunc pro tunc*. **Commonwealth v. Wright**, 846 A.2d 730, 735 (Pa. Super. 2004). Here, the trial court failed to inform Appellant of these rights on the record or in its judgment of sentence. Therefore, we will not fault Appellant for failing to

appeal within thirty days after imposition of sentence. We decline to quash this appeal.

In his first argument on appeal, Appellant challenges the sufficiency of the evidence underlying his conviction for indirect criminal contempt. Appellant does not deny that he contacted Appellee by sending her a letter on May 29, 2014. Instead, Appellant claims that Appellee deliberately delayed filing her contempt petition until March 19, 2015, ten months after his letter, and as Appellant neared his parole date on his prior sentences. Appellant's Brief at 16. Appellant complains that the purpose of this delay was to induce the trial court, who "disliked Appellant," to invent a pretext for keeping him in jail past his parole date. *Id.* at 13, 16. Appellant insists that Appellee's actions "were vindictive in nature and not for [her] protection . . . or [her petition] would have been filed sooner." *Id.* at 13. We disagree.

When examining a challenge to the sufficiency of the evidence, our standard of review is well settled:

> The standard we apply . . . is whether viewing all the evidence admitted at trial [] in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the

crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced is free to believe all, part or none of the evidence.

*Commonwealth v. Brumbaugh*, 932 A.2d 108, 109-10 (Pa. Super. 2007) (citation omitted).

The Protection from Abuse Act, 23 Pa.C.S. §§ 6101-6122, empowers courts to hold a defendant who violates a PFA order in "indirect criminal contempt and punish the defendant in accordance with law." 23 Pa.C.S. § 6114(a). "A charge of indirect criminal contempt consists of a claim that a violation of an order or decree of court occurred **outside the presence of the court**. Where a PFA order is involved, an indirect criminal contempt charge is designed to seek punishment for a violation of the protective order." *Commonwealth v. Baker*, 722 A.2d 718, 720 (Pa. Super. 1999) (*en banc*) (citations omitted) (emphasis added).

The elements of criminal contempt are:

(1) the order must be definite, clear, specific and leave no doubt or uncertainty in the mind of the person to whom it was addressed of the conduct prohibited, (2) the contemnor must have had notice of the specific order or decree, (3) the act constituting the violation must have been volitional, and (4) the contemnor must have acted with wrongful intent.

*Id.* at 721 (citation omitted). "As with any other criminal proceeding, [the defendant] may be found guilty of the charged offense only if the

- 10 -

Commonwealth proves every element beyond a reasonable doubt."

***Commonwealth v. Nelson***, 690 A.2d 728, 732 (Pa. Super. 1997) (citation

omitted).

The trial court explained that the evidence satisfies every element of

indirect criminal contempt:

> Initially, the [c]ourt states that it found the testimony of the Appellee to be fully credible. With regard to the enumerated factors that require our review: First, the [c]ourt found that the 2012 PFA Order that Appellant was charged with violating was definite, clear, specific, and left no doubt or uncertainty. In the Order, Appellant was specifically prohibited from having "ANY CONTACT" with Appellee, either directly or indirectly, at any and all locations. The Order further specified that Appellant shall not contact Appellee, "either directly or indirectly, by telephone, or by any other means, including through third persons." The Order could not have been clearer in its direction to Appellant to cease all contacts with Appellee, including contacts via mail. Yet, Appellant sent a letter while incarcerated that was addressed to and received by Appellee on May 29, 2014.

> Second, the [c]ourt found beyond a reasonable doubt that Appellant had notice of the 2012 PFA Order. The Order itself was entered at a hearing in open [c]ourt and was done by agreement. The Appellant was present throughout the proceeding, was represented by counsel[,] and the Agreement was signed by Appellant. Accordingly, there is no dispute that Appellant knew of the Order.

> Third, the [c]ourt found beyond a reasonable doubt that Appellant's act of sending the letter to Appellee was volitional. Appellant's actions of writing out a letter, addressing and mailing the envelope, and seeing to it that it was mailed, were not coerced or accidental. Appellant took deliberate actions in sending Appellee the letter.

> Furthermore, the [c]ourt found that Appellant was the sender of the letter beyond a reasonable doubt. Again, the

[c]ourt found Appellee and Detective Stark's testimonies to be credible. The [c]ourt disbelieved Appellant's halfhearted contention, as suggested in the questioning that he was not the person who sent the letter received by Appellee. At the hearing, the [c]ourt heard evidence relating to Appellee's first-hand knowledge and ability to recognize the letter as being sent by Appellant. Appellee indicated she had received somewhere in the neighborhood of thirty letters from Appellant previously. Appellee testified that the letter was addressed to her from Appellant with a return address of the prison where Appellant was serving time. Appellee also testified that she knew the letter to be from Appellant because the content of the letter contained intimate details only Appellant would know.

The [c]ourt disbelieved Appellant's argument that since Appellee did not open the letter herself, the letter must have been tampered with by the police. At the hearing, testimony were elicited from Appellee and Detective Stark as to who exactly opened the letter. It turns out [that] Appellee had immediately turned the letter over to the police before even opening the letter. Appellee was aware of the contents of the letter only after Detective Stark had opened the letter and sent an electronic scanned copy of the letter to Appellee.

In addition, when Appellant was made aware of this event, he voiced his objections and demanded to know whether the envelope containing the letter also contained a card. While Appellant and Detective Stark have no recollection of any card being included in the letter and the fact that the inclusion of any card was irrelevant to a finding of contempt, Appellant in essence tacitly admitted that he sent the letter. Appellant would only be aware of the contents of the letter and potential inclusion of a card if he had prior knowledge that the letter was sent.

As for the fourth and final factor, the [c]ourt found that Appellant acted with wrongful intent. Counsel for Appellant elicited from Appellee at the hearing that the content of the letter sent included an apology by Appellant for his past behavior. While the [c]ourt is aware of the supposed general apologetic contents of the letter, it is not

- 12 -

persuaded that the letter was not made without wrongful intent. The letter also indicated a possible plan for Appellant to join a foreign army (apparently a past theme of Appellant) and an invitation for Appellee to live abroad with Appellant/Defendant upon his release. Again, ANY contact is and was a direct violation of the PFA Order.

Here, Appellant while imprisoned for past abuse and harassment of Appellee, including having previously unlawfully contacted the Appellee from a prison, sent Appellee an unwelcome letter, again from prison, in direct violation of the conditions of his sentence and the PFA Order. Although the letter may initially seem benign, it carries with it a more sinister intent. According to Appellee's documentation and testimony at the hearing, Appellant has a history of constant abuse and intimidation that would be interjected with apology. The abuse and harassment would essentially cycle between intimidation and apology. However, after each apology, Appellant would soon revert back to his abusive and harassing behavior including making threats against Appellee if she did not drop criminal charges against him.

The fact that Appellant's letter contained, in part, an apology for his past behavior does not sway the [c]ourt from concluding that the main reason for the letter was an attempt to reintroduce himself into Appellee's life once again. When accompanied by a review of his past behavior and his unusual and inappropriate conduct at the hearing, the [c]ourt re-states its suspicion that what Appellant wanted all along was a chance to see Appellee in [c]ourt again, to express his feelings again, and to intimidate her again. Accordingly, the [c]ourt finds Appellant's apology in the letter disingenuous, and in light of the facts and circumstances in this case as developed in the testimony and documentation presented at the hearing, the [c]ourt's finding of criminal contempt was proper.

Trial Ct. Op. at 20-23 (record citations omitted). We agree with the trial court's excellent analysis and hold that the evidence is sufficient to sustain Appellant's conviction for indirect criminal contempt. By focusing on

Appellee's ten-month delay in filing the contempt petition, Appellant attempts to divert our attention from his blatant violation of the trial court's order prohibiting any contact with Appellee. In addition, we know of no legal authority precluding Appellee from filing a PFA petition ten months after receiving Appellant's letter. For these reasons, Appellant's first argument fails.

In his second argument on appeal, Appellant claims that the trial court erred in finding Appellant in contempt for a letter written on or about May 29, 2014. Once again, Appellant insists that the timing of Appellee's contempt petition overrides his violation of the "no contact" provision in the trial court's order. For the reasons provided in response to Appellant's first argument, we find his second argument devoid of merit.

In his third issue on appeal, Appellant argues that the trial court erred by denying his motion for discovery under Pa.R.Crim.P. 573, which governs discovery in criminal cases. Appellant contends that the contempt proceeding was criminal in nature because the District Attorney prosecuted the matter instead of Appellee. Appellant's Brief at 9. Therefore, he concludes, the discovery provisions in the Rules of Criminal Procedure apply. We agree with the trial court that Pa.R.Crim.P. 573 does not apply to the present case.

This case arises under 23 Pa.C.S. § 6114, a provision within the Domestic Relations Code. The Pennsylvania Rules of Criminal Procedure

state that "[u]nless otherwise specifically provided, these rules shall not apply to . . . domestic relations proceedings." Pa.R.Crim.P. 100(a). The comments to Pa.R.Crim.P. 573 further state that Rule 573 "is intended to apply only to court cases[,]" Pa.R.Crim.P. 573 cmt., that is, cases "in which one or more of the offenses charged is a misdemeanor, felony, or murder of the first, second, or third degree." Pa.R.Crim.P. 103.

This Court has stated that "[r]ecognizing the inherent criminal nature of [indirect criminal] contempt, the legislature has enshrouded the proceeding with appropriate procedural safeguards." *Cipolla v. Cipolla*, 398 A.2d 1053, 1056 (Pa. Super. 1979). However, those safeguards need not rise to the level of a criminal proceeding. *See id.* at 1057 ("(N)o need exists to fit criminal contempt, a crime sui generis, into the mold of procedures created for more commonplace offenses." (citations and quotation marks omitted)); *see also* 23 Pa.C.S. § 6114(b)(3) ("The defendant shall not have a right to a jury trial on a charge of indirect criminal contempt"), (d) ("Disposition of a charge of indirect criminal contempt shall not preclude the prosecution of other criminal charges associated with the incident giving rise to the contempt, nor shall disposition of other criminal charges preclude prosecution of indirect criminal contempt associated with the criminal conduct giving rise to the charges.").

These authorities demonstrate that Appellant has no right to obtain discovery under Pa.R.Crim.P. 573. We further agree with the trial court's observation that Appellant

> had [all] necessary information and documentation to be apprised of the nature of the proceedings against him[] and to be properly prepared to defend his case in [c]ourt. Appellant had what all defendant in PFA contempt proceedings have[:] a copy of the original PFA order and a full copy of the [p]etition [a]lleging [c]ontempt of a [PFA] [o]rder.

Trial Ct. Op. at 9.

In his fourth issue on appeal, Appellant challenges the trial court's refusal to allow him to represent himself *pro se* during the contempt hearing. We conclude that no relief is due.

Just as a criminal defendant has a constitutional right to counsel, so does the defendant have "a long-recognized constitutional right to dispense with counsel and to defend himself before the court." ***Commonwealth v. Starr***, 664 A.2d 1326, 1334 (Pa. 1995) (citation omitted). The right to self-representation, however, is not absolute. ***See Commonwealth v. Staton***, 12 A.3d 277, 282 (Pa. 2010). "A request to take on one's own legal representation after meaningful proceedings have begun does not trigger the automatic constitutional right to proceed *pro se*. The decision instead is left to the sound discretion of the trial court." ***Commonwealth v. El***, 977 A.2d 1158, 1165 (Pa. 2009) (citation omitted). "Meaningful proceedings" have begun "when a court has begun to hear motions which have been reserved

for time of trial; when oral arguments have commenced; or when some other such substantive first step in the trial has begun." *Id.* (citation omitted).

When Appellant moved to proceed *pro se*, the trial court had already (1) begun the hearing, (2) heard most of Appellee's testimony on direct examination, (3) denied Appellant's discovery request, and (4) denied Appellant's request for new court-appointed counsel. Under these circumstances, the trial court had the discretion to deny Appellant leave to proceed *pro se*. *See id.* The trial court aptly recognized that Appellant had no reasonable basis for proceeding *pro se* but was merely "do[ing] all he could to create disruption, delay, and confusion[] and to lengthen the time he was in the [c]ourtroom with Appellee." Trial Ct. Op. at 15. Thus, the trial court acted within its discretion in denying Appellant leave to represent himself *pro se*.

We review Appellant's fifth and sixth arguments together. In both arguments, Appellant contends that the trial court abused its discretion by sentencing him to six months' imprisonment consecutive to his current sentence.

Both issues are challenges to the discretionary aspects of Appellant's sentence. This Court has held:

> Challenges to the discretionary aspects of sentencing do not entitle an appellant to appellate review as of right. Prior to reaching the merits of a discretionary sentencing issue:

> [w]e conduct a four part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).
>
> Objections to the discretionary aspects of a sentence are generally waived if they are not raised at the sentencing hearing or raised in a motion to modify the sentence imposed at that hearing.

*Commonwealth v. Evans*, 901 A.2d 528, 533-34 (Pa. Super. 2006) (some citations and quotation marks omitted).

Appellant failed to explain during the contempt hearing why his sentence was excessive. He merely stated, without elaboration, that "the law does not allow [the trial court] to make [Appellant's sentence] consecutive" to his current sentence. N.T., 5/25/16, at 99. Appellant also failed to file post-sentence motions challenging the excessiveness of his sentence. Ordinarily, this would constitute a waiver of his right to challenge the excessiveness of his sentence on appeal. *See Evans*, 901 A.2d at 533-34. In this case, however, we will excuse this omission due to the trial court's failure to apprise Appellant of his right to file post-sentence motions.

Nevertheless, we conclude that the trial court had ample reason for imposing a consecutive sentence in view of Appellant's long history of

- 18 -

abusive behavior towards Appellee, his refusal to stop contacting her, and his reprehensible conduct during the contempt hearing.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/23/2017